JOHN B. MARSH AND ISABEL S. MARSH (HUSBAND AND WIFE), PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 81527.   Promulgated October 14, 1938.

*Russell L. Bradford, Esq., Rollin Browne, Esq.,* and *George H. Craven, Esq.,* for the petitioners.

*DeWitt M. Evans, Esq., Philip A. Bayer, Esq.,* and *Breedlove Smith, Esq.,* for the respondent.

890

896

OPINION.

LEECH: The petitioners contend that the preference stock in International became worthless in 1932. They argue that the events occurring in that year, which establish its worthlessness, were the death of Kreuger, the adjudication of the corporation as a bankrupt, the public disclosure of the frauds and embezzlements perpetrated by Kreuger, followed by the disappearance of a market value for the stock. It is therefore their position that all reasonable hope or expectation that the holders would ever receive anything on account of it thus vanished in that year. The respondent denies that the stock became worthless during 1932. He argues that it continued to have value at least until 1936, when it was exchangeable for participating certificates in Imco, which in turn also had value. He concedes, however, that if the stock became worthless in 1932, the petitioners are entitled to the deduction taken in their return as a loss on the stock.

The question of whether property becomes worthless during a particular year is one of fact. *Brown* v. *Commissioner*, 94 Fed. (2d) 101; *M. Rea Gano*, 19 B. T. A. 518. The determination of that fact then calls for a practical, not a legal, test. *Lucas* v. *American Code Co.*, 280 U. S. 445. Usually, losses are evidenced by closed and completed transactions. However, the statute and regulations permit the deduction of losses which are not fixed by closed and completed transactions but which are determinable upon the occurrence of other identifiable events. A loss fixed by such identifiable events may be deductible, within the act and regulations, without the taxpayer establishing that no possibility of eventual recovery of any portion of his investment exists. Thus, in deducting losses on worthless investments a taxpayer is not required to be an incorrigible optimist. *United States* v. *White Dental Manufacturing Co.*, 274 U. S. 398; *Brown* v. *Commissioner*, *supra*. "An identifiable event", other than a closed transaction, fixing a loss, has been described as "an incident or occurrence that points to or indicates a loss—an evidence of a loss." *Industrial Rayon Corporation* v. *Commissioner*, 94 Fed. (2d) 383. Among such identifiable events which establish the worthlessness of corporate stock and the consequent right to a deduction of a loss thereon, is judicial bankruptcy of a corporation that is hopelessly insolvent. *Jeffery* v. *Commissioner*, 62 Fed. (2d) 661; *William L. Taylor*, 37 B. T. A. 1055.

The record is replete with evidence of gigantic frauds perpetrated by Kreuger over a period of years through forgeries, deliberate and systematic false representations, misappropriation of assets, the violation of the confidence reposed in him by business associates, and/or otherwise. His death, in March 1932, and the immediately following revelation of the chaotic financial condition existing in the corporate empire dominated by him, were the signals for the comprehensive and intensive investigations that were immediately begun in the United States and abroad. Very early, these investigations disclosed that this corporate empire, including International, was a victim, of his wrongdoing. By the end of 1932, it was generally known that his fraudulent practices had been extensive and exceedingly damaging to the financial welfare of the corporations dominated by him.

The first tentative report of the receiver in bankruptcy, dated May 13, 1932, disclosed that, at the close of business on April 13, 1932, the unaudited books of International showed assets of approximately $197,000,000 and a surplus of about $14,000,000 above liabilities and outstanding capital stock. Investigations made in 1932 revealed that this picture was completely false; that many of the items listed on the books as assets were fictitious and worthless; that the values shown for

many others were greatly overstated and that other assets in large amounts, recorded on the books, were not in the possession of the corporation and that their recovery, even if possible, would be dependent on the outcome of legal proceedings. By the end of 1932, the trustee in bankruptcy, who formerly had been the receiver, had only been able to reduce to possession securities having a cost of about $60,000,000, as shown by the books, and had on hand about $1,700,000 in cash, of which $1,380,000 was in a special fund pending determination of certain adverse claims with respect to it. Before January 31, 1933, the trustee had instituted suits against the directors of International for approximately $135,000,000, against certain banks for about $4,-000,000 and for the recovery of income tax of about $2,290,000 which it was alleged was erroneously paid. As against the facts disclosed in the foregoing description of the condition with respect to assets, as of January 31, 1933, claims on debentures, alone, in an amount in excess of International's total outstanding liabilities of $105,444,-014.43, as shown by its books, had been filed against the estate. While some of these claims had, doubtless, been improperly filed and were later disallowed by court order, such action had not been taken at that time. In addition, claims filed by or on behalf of the Swedish Match Co., A/B Kreuger & Toll (Swedish and American estates), and Dutch Kreuger & Toll aggregated approximately $1,200,000,000. Although the trustee was contesting the last mentioned claims, they had not been adjudicated. Further, the Federal Government had under advisement the assessment of an additional income tax for 1931 of approximately $1,000,000, and this assessment was subsequently made.

Upon the unanimous request of the representatives of the creditors of International, the trustee did not, at the beginning of its administration of International's affairs, make any attempt to dispose of its assets, either in their entirety or piecemeal. No possibility existed for their sale as an entirety and any expenditure toward that end would probably have been useless. Piecemeal sales could not have been made at prices approximating the true value of the assets. As a result of vigorous and protracted negotiations in the settlement of intercompany claims and controversies, the recovery of assets and an orderly disposition of assets, as well as allowing liberal values for the principal assets undisposed of, it appears that the net value of International's assets after the payment of administration expenses, etc., was approximately $37,000,000, or about $61,000,000 less than the amount of the uncontested and allowed claims of creditors which were entitled to priority over the preference stock.

In our opinion, the situation existing at the close of 1932 clearly indicated that International was hopelessly insolvent. That such was the then view of the holders of and others interested in its outstand-

ing obligations and stock, is shown by the quotations on the New York Stock Exchange in November 1932 of from $65 to $102 per $1,000 face amount of its debentures and the public sales of the preference stock in December of that year, the proceeds from which were insufficient to pay the expenses incident thereto. While the public sales of preference stock were probably for the sole purpose of establishing losses, the negligible prices received, when considered in the light of known facts, tend to indicate that the sellers and buyers considered the stock was practically worthless. Subsequent developments only confirm what was known and generally regarded to be International's real financial condition in 1932.

In its reports to the court, to and including that of February 8, 1933, the trustee refrained from expressing its opinion as to the value of International's assets. From an examination of those reports it seems that the trustee's action in this respect was not due to its opinion or belief that International was solvent, but resulted from its desire to avoid expressing an opinion of value which might finally prove to be excessive. The trustee merely presented the facts in its possession to the court and the public. It was left to the interested parties, themselves, to draw their own conclusions as to whether the company was insolvent.

The respondent contends that the "over the counter" sales of the preference stock, made within the price ranges per share of a high of 62 cents and a low of 12½ cents in 1932, following the month of May, of a high of 25 cents and a low of 17½ cents, in 1933; of a high of 16½ cents and a low of 10½ cents, in 1934; and of a high of 27½ cents and a low of 11½ cents in 1935, established that the stock continued to have value, not only throughout 1932 but during subsequent years through 1935. Applying the foregoing per share prices to 750 shares of preference stock, the number of shares owned by Isabel S. Marsh, and making allowance for brokerage commission and transfer taxes, the respondent computes maximum and minimum values for the block of stock as follows: $429 and $54 in 1932; $135.75 and $79.50 in 1933; $72 and $27 in 1934; $154.50 and $34.50 in 1935. The record is silent as to the number, frequency, or size of the sales upon which the respondent relies. Whether they were scattered, isolated transactions involving only a few shares each, we do not know. Aside from the showing that they were made "over the counter", nothing is revealed of the circumstances surrounding any of them. In view of this condition of the record and of the public sales made about the end of 1932, the proceeds from which did not meet the expenses thereof, and considering the generally recognized insolvent condition of International in 1932, we think that these sales upon which the respondent relies, were of a type that is made for the purpose of establishing losses or represent purchases made by

optimists in defiance of reason and the generally known and accepted facts. Transactions of that type do not establish value for stock that is already worthless. *Brown* v. *Commissioner*, *supra*; *Wesch* v. *Helburn*, 5 Fed. Supp. 581.

The respondent argues that the agreements of December 17, 1924, between the Swedish Match Co. and International and the holders of its preference stock, by reason of which it was possible for the Imco plan to be negotiated by the protective committee for the holders of preference stock, gave added value to the preference stock. A careful examination of the agreements in connection with the various prospectuses given to the public at the time of the offering of the different issues of preference stock, indicates that their primary purpose was to promote the sale of preference stock by attempting to mislead the public into believing that the preference stock was, in some way, backed by the Swedish Match Co. However, assuming that they were valid, which the Swedish Match Co. denied, the most that can be found in the agreements is that they imposed restrictions on the sale by the Swedish Match Co. of the common stock held by it in International and restricted the declaration of dividends on its own stock by the Swedish Match Co. The respondent does not point out, nor is it apparent, that a violation of these restrictions would be injurious or damaging, necessarily, to the holders of preference stock in International. Although the petitioners were not familiar with the existence of these agreements prior to 1936, all the prospectuses given to the public in connection with the offerings of preference stock, refer to the agreements, and the prospectus, issued in connection with the offering of such stock in 1924, contains a fairly clear summary of the agreements. In view of this, we think it is only reasonable to conclude that the public, generally, knew of the existence of the agreements, was fairly definitely informed as to their contents, and gave such consideration to them as was deemed warranted in making purchases and sales of preference stock, both before and after International's adjudication as a bankrupt. Whatever value, if any, the agreements gave to the preference stock, was reflected in the price at which the stock was sold. There is not only nothing to show that the Swedish Match Co. violated its part of the agreements, but there is evidence which indicates performance of the portion relating to the retention of a majority of the common stock in International. There is no evidence that International ever performed under the agreements. Under these circumstances the agreements appear, at best, to have had only a nuisance value. We are unable to say that they gave any appreciable value to the stock. This is demonstrated by the offer to the holders of preference stock under the Imco plan.

For the issuance of its preference stock, International had received very substantial sums of money just as it had in connection with the

issuance of its debentures. It was, therefore, natural for the protective committee for the holders of preference stock to try to obtain something of value for the holders of such stock. The Imco plan was used for the settlement of intercompany claims and the purchase of certain assets by the Swedish Match Co. The plan as proposed, in effect, offered, for a limited period ending June 30, 1938, to the holders of preference stock in the United States, a group of speculations, namely: That the selling price of class B stock in the Swedish Match Co. would increase; that the London buying price of Swiss Kronor would remain stationary or at least not increase; and that, since the stock was to be sold outside of the United States, the exchange rate between the country in which the stock was sold and the United States would be favorable for making remittance to the holders of preference stock in the United States. On June 8, 1936, two days before the protective committee announced that the Imco plan would be offered to the holders of preference stock, the average selling price, on the London Stock Exchange, of class B shares in the Swedish Match Co. was equal to the London buying price of only about 19 Swedish Kronor, or a price which was below that at which any of such shares could be sold under the Imco plan. The evidence indicates that at that time on the London Stock Exchange, the shares were selling around the lowest price for the preceding period of about three months. That what was offered the holders of preference stock under the Imco plan, was of a highly speculative character, is demonstrated by the nominal and erratic prices at which Imco participating certificates were quoted.

At the time of the submission of the proceeding Isabel S. Marsh had received nothing from the Imco participating certificate which she had received in exchange for her shares of preference stock in International. Whether she received anything between that date and June 30, 1938, when the rights under the certificates expired, we do not know. However, if she did, such recoupment of her loss resulting from the preference stock would not be fatal to her position here since she did not have the burden of showing that there was no possibility of recovering any portion of her investment. *United States* v. *White Dental Manufacturing Co.*, *supra*.

After having duly considered the evidence we are of the opinion that the preference stock in International became worthless in 1932 and have so found as a fact. It follows that the petitioners are entitled to the deduction taken in their return with respect to the shares of such stock held by Isabel S. Marsh. Cf. *Robert Ridgway*, 35 B. T. A. 122 (on appeal C. C. A., 2d Cir.).

Reviewed by the Board.

*Decision will be entered under Rule 50.*