## YOUNG v. COMMISSIONER OF INTERNAL REVENUE.

### No. 15.

Circuit Court of Appeals, Second Circuit.

Nov. 17, 1941.

Frederic P. Warfield, of New York City, for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and S. Dee Hanson, Sp. Assts. to the Atty. Gen., for respondent Commissioner of Internal Revenue.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

In 1936 the taxpayer, Minnie K. Young, held 175 shares of participating preference stock of the International Match Company which she had purchased in 1925, 1926 and 1929 at a total cost of $9,972.50. She claimed a deduction of that amount from her 1936 gross income on the ground that the shares became worthless in that year. She had sought to take the same deduction from her 1934 income because of worthlessness accruing during that year, but no loss for 1934 was allowed by the Commissioner because: "the present knowledge of the affairs of the company and the value of its assets are insufficient to show that the participating preferred stock became worthless in 1934 * * *". In connection with the return for 1934 the petitioner testified that at a conference between herself and a revenue agent the agent stated that the loss "could not be taken for 1934 but should be taken in 1936 when the loss would become total on November 4, 1936 provided the petitioner did not participate in the reorganization by exchange of such shares for Imco shares." In John B. Marsh v. Commissioner, 38 B.T. A. 878, the Board held that under circumstances practically identical with those here participating preference stock of International Match Company became worthless in 1932. In the case at bar the Board in substance adopted and reiterated its findings in the Marsh litigation.

On April 13, 1932, an equity receiver of the assets of the International Match Company was appointed by the United States District Court for the Southern District of New York and on April 15, 1932, there was a voluntary adjudication of the International Match Company in bankruptcy by that court.

In May, 1932, the range of prices for the stock on the New York Stock Exchange was high—37½ cents, and low—25 cents per share. In November and December of

that year the over-the-counter prices in New York, Boston and Philadelphia varied from a bid price of from 6¼ to 20 cents, and from an asked price of from 12½ to 37½ cents per share. During those months sales of the stock through Adrian H. Miller & Sons in New York and R. L. Day & Co. in Boston varied from 24 cents to about 1 cent per share for a lot of 100 shares. The cost of selling the shares at this time equalled or exceeded the prices that could be obtained.

In a letter dated October 7, 1932, from the chairman of the Protective Committee for holders of the participating preference stock the holders were informed that an investigation then being made of International and the Swedish Match Company, which held the common stock of the former company, "would probably show that the liabilities of International were substantially in excess of its assets."

On July 1, 1936, in order to facilitate the settlement of the intercompany claims of subsidiaries and other companies involved in the bankruptcy of International Match Company and the purchase of certain assets of the bankrupt corporation and of one of its subsidiaries, the Swedish Match Company, owner of nearly all the common stock of International, offered to provide for settlement of claims of holders of the preference stock. The offer contemplated the formation of a corporation known as Imco which would offer to exchange one participating certificate in Imco for two shares of International. The taxpayer did not avail herself of the option, which expired November 4, 1936. The bid and asked prices during the period within which she might have exercised her option varied from 15 to 75 cents for each certificate to an asked price of from 30 to 100 cents therefor; in other words, the highest price the certificates of Imco issued against the 175 shares might have realized during 1936, if the option had been exercised, would have amounted to .75 x 87.50—a commission of $5.25, or a net of $60.38.

Kreuger, the central figure of International and its group of affiliated companies, shot himself and died on March 12, 1932. Investigations made by Price, Waterhouse & Company covering the period from March 17 to March 31, 1932, showed that of the $770,400,000, representing capital investments in the companies and advances by banks to those companies, $179,100,000 had been paid out as interest on debentures and as dividends to stockholders, that $115,800,000 had been withdrawn and misappropriated by Kreuger and that the balance had been invested in government and other securities, and in associated companies within the Kreuger group, as well as in monopoly concessions. The report further showed that of the published consolidated or book earnings of $316,100,000, the approximate actual earnings were only $40,500,000, or an over-statement of $275,600,000. By January 31, 1933, more than 23,000 claims had been filed against the estate of International of the total amount of $1,206,138,420.11. The claims were contested by the trustee who was of the opinion that the estate of International was a substantial creditor of the claimants. The adjustment of the conflicting claims finally occurred in 1936 when Imco was incorporated and the International participating preference stockholders were granted the option we have already referred to.

██ Up to February 17, 1938, the trustee of International had paid a total of $274 upon each $1,000 face value of the company debentures, as a result of which there remains due and unpaid on each $1,000 of debentures the principal amount of $726 plus accrued interest. We think there can be little doubt that the participating preference stock of International became worthless in the year 1932. The only difference between the situation of the taxpayer here and that of John B. Marsh v. Commissioner, 38 B.T.A. 878, dealt with by the Board, is that she claims she did not know of the insolvency of the company in 1932. This, in our opinion, made no difference when it was in fact insolvent, the stock was only selling at nominal figures, and bankruptcy had been adjudicated in that year. But even if the stock had some slight value in 1932, the taxpayer did not sustain the burden of showing that it became worthless in the year 1936 for which she has attempted to obtain the deduction.

██ The question is whether a gamble which, as matters turned out, would have enabled the taxpayer to salvage about ⅝ of 1% out of an investment of $9,972.50 justified her in clinging to the hope that her stock in a corporation that became bankrupt in 1932 had not become worthless until 1936. Certain speculative chances of getting something out of adjustments or litigations on the part of International, against which the pessimistic letter of October 7, 1932, stood as an early and well founded warn-

ing, furnished no sound basis for any hope of an ultimate substantial value.

We think the Board and the Commissioner would have been fully justified in finding that the stock became worthless in 1932. Such a trifling realization as $60 which the taxpayer apparently might have obtained as the result of the negotiations in 1936 represented nothing more than nuisance value. Awaiting the outcome of an internecine conflict, when the situation in 1932 not only seemed, but actually turned out to be, so hopeless, did not defer her obligation to claim any deduction that she might seek to obtain under Section 23(e) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev. Code, § 23(e), during the first year that it was available. United States v. White Dental Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120; DeLoss v. Commissioner, 2 Cir., 28 F.2d 803.

Whether 1932 or 1936 be taken as the time when the stock became worthless, in each year there was an identifiable event— in the first bankruptcy, and in the second the expiration of the option in Imco. While the taxpayer may not have known that the corporation was actually insolvent, an adjudication in bankruptcy was a strong indication of the lack of any equity in the stock. She knew, or was in a position to know, the desperate situation and the inability of an owner to realize any substantial amount for the participating preference shares. The ability to get some trifling price was not sufficient, in our opinion, to show that the stock was not in every real sense worthless. Such market transactions as there were did not essentially differ from the sale in 1932 for $1 of stock that had become worthless in the preceding year, which we dealt with in Schmidlapp v. Commissioner, 2 Cir., 96 F.2d 680, 682, 118 A.L.R. 297. In Mahler v. Commissioner, 2 Cir., 119 F.2d 869, we held that in the particular facts of that case it could not be said that only an incorrigible optimist could have formed an opinion that the stock had any real value in the year during which the Board found it to be worthless. In the case at bar on the contrary the Board was justified in finding that the taxpayer had not sustained the burden of establishing worthlessness in 1936. Keeney v. Commissioner, 2 Cir., 116 F.2d 401. In cases like this the taxpayer is at times in a very difficult position in determining in what year to claim a loss. The only safe practice, we think, is to claim a loss for the earliest year when it may possibly be allowed and to re-new the claim in subsequent years if there is any reasonable chance of its being applicable to the income for those years.

Order affirmed.