JAMES J. FLOOD AND DONNA A. FLOOD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Flood v. Commissioner
Docket No. 17066-82.
United States Tax Court
T.C. Memo 1986-65; 1986 Tax Ct. Memo LEXIS 545; 51 T.C.M. (CCH) 455; T.C.M. (RIA) 86065; February 11, 1986. James J. Flood, pro se. Irene Scott Carroll, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: With respect to petitioners' Federal income tax for 1978, respondent determined a deficiency of $13,036, and an addition to tax of $900.95 under section 6651(a)(1). [1] After concessions, the issues for consideration are (1) whether certain stock issued to petitioner [2] qualifies as section 1244 stock, (2) whether this stock became *548 worthless in 1978 or 1977, and (3) whether petitioners had reasonable cause for failing to timely file their 1978 Federal income tax return. FINDINGS OF FACT Some of the facts have been stipulated by means of a stipulation of facts, as amended, along with attached exhibits, all of which are incorporated herein by this reference. Petitioners are husband and wife. During the taxable year at issue, petitioners resided in La Jolla, California. Petitioners filed their 1978 U.S. Individual Income Tax Return with the Internal Revenue Service Center in Fresno, California. Although their return was due April 16, 1979, petitioner did not mail it until April 23, 1979. Petitioner lacked reasonable cause for filing late. In 1974 petitioner started a business, Lil David Gawfe Tools, Inc. (Lil David). Lil David incorporated in California on May 20, 1974, for the primary purpose of manufacturing and selling golf clubs, shafts, heads, equipment, tools and accessories. Lil David was authorized *549 to issue only one class of stock, in the total number of 2,500,000 shares, with each share having a par value of one cent for an aggregate bar value of $25,000. Irving Fields, Monica Wood and Lynne Colvig incorporated Lil David and were appointed as its first directors. On June 17, 1974, the board of directors of Lil David held its first meeting. The minutes of this meeting reflect that at this time Fields, Wood and Colvig resigned and were succeeded as directors by petitioner, Bill Bailey and Robert Gould. The minutes further reflect that petitioner became chairman of the board and was president of Lil David.With respect to qualification of Lil David's stock under section 1244, the minutes state as follows: ADOPTION OF 1244 PLAN
Mr. Fields discussed the requirements necessary for being a small business under Section 1244 of the Internal Revenue Code. The Board therefore is adopting a written plan to qualify the stock under Section 1244 of this code. RESOLVED, that: 1. Only one class of stock be authorized which is common stock. This stock is nonconvertable [sic] into any other securities of the corporation. 2. The Corporation qualifies *550 as a small business corporation and only common stock will be outstanding. 3. The stock will be issued in exchange for money or property other than stock or security. 4. The amounts of money or property to be paid for the stock offered as a contribution to capital and as paid in surplus shall not exceed $500,000. 5. The amounts to be paid for the stock offered under this written plan plus the equity Capital of the Corporation as of the date of the adoption of the plan shall not exceed $1,000,000. A typed, unsigned writing on the stationery of Fields, Fehn & Feinstein, Attorneys at Law, bearing the date June 17, 1974, provides as follows: Section 1244 I.R.C. Requirements
1. Written plan. 2. Common stock. 3. Domestic corporation. 4. Two year maximum stock issuance period, after date plan adopted. 5. "Small business corporation" at time plan adopted a. $500,000.00 amount to be paid for stock limitation b. $1,000,000.00 equity capital limitation 6. No prior offering outstanding 7. Stock issued for dollars and/or property 8. No new offering to issue stock after adoption of plan and before section 1244 stock used. *551 On July 1, 1974, Lil David filed an application to issue stock with the California Department of Corporations. On July 11, 1974, Lil David received its first permit to issue stock. On July 16, 1974, petitioner was issued 90,000 shares for $900. On October 6, 1975, Lil David applied to the Department of Corporations for a permit to issue 130,500 shares of common stock at $6 per share, for a proposed maximum aggregate offering price of $783,000. At the time of the application, Lil David had outstanding 142,000 shares of common stock. The application and the minutes of a board of directors meeting held on October 27, 1975, reflect that the application was filed to enable Lil David to offer the following numbers of shares to the following individuals and entity: 36,000 shares of stock to petitioner and Scottish Golf Company, his affiliate, in cancellation of $216,000 of indebtedness due petitioner and his affiliate; 94,214 shares [3] on a preemptive basis to stockholders of record; and, after the date of the preemptive offer, any number of shares to George Swerdlow and Frank Vivacquia, provided the total number of shares sold to shareholders and the two persons mentioned did not exceed *552 94,214 shares. A permit was granted on October 14, 1975. The board approved the offering at its October 27, 1975, meeting. On December 1, 1975, petitioner received 22,443 shares of Lil David stock as part of this offering, in exchange for the cancellation of $134,658 of debt owed him for loans made to the corporation between May 1974 and October 1975. At the time they obtained the new permit to issue stock, the directors of Lil David did not adopt a new plan under section 1244. Petitioner believed that Lil David already had a valid section 1244 plan that would cover the new stock issuance made pursuant to the October 14, 1975, California Department of Corporations permit. Lil David ultimately received less than $500,000 from the sale of all offerings of stock. Lil David eventually suffered severe financial reverses and on or before October 19, 1977, petitioner was aware that the corporation might fold. By letter of that date, petitioner advised shareholders of Lil David's circumstances. *553 The letter related that in 1975 Lil David had refused delivery of "Slinger" golf heads from a casting company called Fansteel. It stated that "Fansteel, Inc., since last January, has offered Slingers * * * at, in some cases, 70% below our price. For the fiscal year ended March 31, we were profitable and would have remained so if Fansteel had not literally put Lil' David out of business." The letter further related that in December 1976 Chemwell Industries had bought approximately 25 percent of Lil David for $125,000, and had lent Lil David $45,000 to purchase new materials. Petitioner further stated: This loan was secured by all my personal stock and all unpledged assets of the Company. At the time there was no doubt that Seibu [a Japanese department store chain] would continue business in large volume. * * * However, because of Fansteel's unfair competition sales fell to almost zero and Chemwell halted the proposed merger. It was a devastating blow. The letter noted that Chemwell had attached the assets and that Lil David did not have the money to bring suit against Fansteel. Petitioner concluded the letter with the following sentence: "Unless we realize victory in *554 a suit against Fansteel, or buy our assets back from Chemwell, the stock is worthless." Lil David subsequently neither bought the assets back nor brought an unfair competition action against Fansteel. From the time he wrote the letter to February 1978, petitioner contacted lenders and other companies in an attempt to borrow enough money to buy back his pledeged stock, and to bring Lil David back to a profitable position. Although these efforts ultimately were unsuccessful, Lil David did engage in a certain amount of business activity through part of 1978. Lil David continued to ship to Seibu department stores. In December 1977, the Professional Golfers Association of Thailand wrote to Lil David about its golf clubs, and in January 1978 Lil David shipped some clubs to the executive director of the association. In January 1978, Lil David sent a Texas company a contract to act as an independent representative for the sale of certain Lil David products to department store outlets. Petitioner, who by that time had been replaced as president of Lil David by the president of Chemwell Industries, was hopeful that the Texas company would buy Lil David's entire inventory of golf clubs. *555 Such a sale, he believed, would make Lil David profitable again and would enable him somehow to buy back his stock. The Texas company, however, neither signed the proffered contract nor bought the inventory. In January 1978, a Canadian company wrote Lil David about acting as its distributor in Western Canada. Petitioner personally did not give up hope of his Lil David stock until sometime between June and August of 1978. On their Form 1040 for 1978, petitioners claimed a capital loss carry-over from 1977, which they attributed to the total worthlessness in the latter year of $134,658 in Lil David stock. They reported no capital gains. Based on the capital loss carry-over, petitioners claimed a $3,000 capital loss on their 1978 tax return. [4]
By notice of deficiency, respondent disallowed the $3,000 capital loss claimed by petitioners, and additionally proposed other adjustments and a 5-percent addition to tax pursuant to section 6651(a). Petitioners subsequently filed a petition with this Court, and then an "Amendment to Petition." In this latter document petitioners asserted that they suffered *556 a $134,658 ordinary stock loss under section 1244 in "1977/1978" on account of the worthlessness of their stock in Lil David. OPINION Issuance of Section 1244 Stock
As a general rule, losses incurred when capital stock becomes worthless are capital losses and are deductible only to the extent of a taxpayer's capital gains plus $3,000 of his ordinary income. See secs. 165(g)(1), 1211 and 1221. Section 1244 provides an exception to this rule for stock qualifying as "section 1244 stock." "Section 1244 stock" is common stock in a "small business corporation" that has "adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan." Sec. 1244(c)(1). To qualify as a "small business corporation," at the time of the adoption of the plan the aggregate amount which may be offered under the plan cannot exceed $500,000. See sec. 1244(c)(2)(A). The parties disagree as to whether the 22,443 shares of Lil David stock issued to petitioner on December 1, 1975, were section 1244 stock. [5] Petitioner *557 maintains that the requirements of section 1244 were met, while respondent asserts to the contrary. We agree with respondent. Petitioners contend that the minutes of Lil David's first board meeting and the note entitled " Section 1244 I.R.C. Requirements" together meet the requirements for adoption of a section 1244 plan. [6] We need not decide whether petitioners are correct. Even if Lil David initially did adopt a valid section 1244 plan, the stock issued to petitioner on December 1, 1975, would not qualify as section 1244 stock because of the size of the offering pursuant to which it was issued. *558 Section 1244(c)(2) restricts the aggregate amount of stock that may be offered under a section 1244 plan to $500,000 or less. The mere possibility that a corporation may issue stock in excess of the $500,000 limitation disqualifies stock as section 1244 stock. Spillers v. Commissioner,407 F.2d 530, 533 (5th Cir. 1969), affg. a Memorandum Opinion of this Court. Although a corporation may change its section 1244 plan, it must continue to adhere to the $500,000 limitation. See sec. 1.1244(c)-1(h)(2), Income Tax Regs.[7]
By permit dated October 14, 1975, Lil David received authority to issue a total of 130,500 shares of common stock at a proposed maximum offering price of $783.000. On October 27, 1975, as reflected in its corporate minutes, Lil David's board met and approved the offering, although the offering exceeded the $500,000 limitation. We recognize that petitioner at this time thought that Lil David was still *559 in compliance with section 1244. However, evidence of the intention to obtain the benefits of section 1244 is not enough in and of itself. Mogab v. Commissioner,70 T.C. 208, 213 (1978). Strict compliance with the requirements of section 1244 and the regulations promulgated thereunder is necessary in order to obtain these benefits. Mogab v. Commissioner,supra at 212. Petitioner was persuasive and effective in his presentation, but the $134,658 of stock issued to him was part of an offering prohibited under section 1244 and, accordingly, we hold that petitioners are not entitled to claim an ordinary loss on its worthlessness. Year of Stock Loss
Section 165(a) allows a deduction for losses sustained during the taxable year. Section 1.165-1(d)(1), Income Tax Regs., provides when the deduction may be taken: A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained. *560 For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year. * * * Where stock which is a capital asset becomes worthless, a capital loss deduction is allowable under section 165(g). The question of whether stock becomes worthless during a particular year is one of fact. Lincoln v. Commissioner,24 T.C. 669, 694 (1955), affd. 242 F.2d 748 (6th Cir. 1957); Marsh v. Commissioner,38 B.T.A. 878, 902 (1938). More than the taxpayer's subjective belief is required to establish that a stock became worthless during a particular year. Boehm v. Commissioner,326 U.S. 287, 293 (1945); Aagaard v. Commissioner,56 T.C. 191, 209 (1971); Hoover v. Commissioner,32 T.C. 618, 630 (1959). The taxpayer must show that the stock had value at the beginning of the year and lost that value during the year. Hoover v. Commissioner,supra at 630. Petitioners argue that Lil David's stock became worthless in 1978. [8] *561 Respondent maintains that the stock became worthless in 1977. [9] We agree with respondent. [10]
*562 The evidence presented shows that Lil David continued to operate through the early part of 1978, and that petitioner did not give up on the corporation until the summer of that year. Nothing in the record suggests, however, that Lil David had any significant volume of sales or business activity during 1978. During 1977 Lil David suffered devastating reverses. Sales had dropped to near zero. Ruinous competition persisted. The assets of the corporation were attached. Money could no longer be raised. In short, the corporation lost its economic vitality. In the absence of persuasive proof that Lil David's stock had value as of January 1, 1978, petitioner's relinquishment of hope for Lil David's revival and total cessation of efforts on its behalf do not constitute identifiable events fixing the loss in 1978. We, accordingly, hold that petitioner's stock in Lil David became worthless in 1977. Addition to Tax for Late Filing
On a return filed after its due date, section 6651(a)(1) imposes an addition to the tax required to be shown on the return. The addition is 5 percent in *563 the case of a return filed less than one month late. A taxpayer may avoid this addition by establishing reasonable cause for filing late. If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Petitioners filed their joint individual income tax return for 1978 on April 23, 1979. The due date was April 16, 1979. At trial, petitioners offered no evidence of reasonable cause for failing to file their 1978 return on time and, on brief, conceded the issue. We, accordingly, hold as correct the 5-percent addition to tax determined by respondent in the deficiency notice. The reflect concessions, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year at issue. ↩
2. As used hereafter, "petitioner" refers to James J. Flood.↩
3. Lil David requested authority to offer 94,500 shares (exclusive of the shares offered petitioner and Scottish Golf Company) in order to round out all fractional shares to a whole number.↩
4. Sec. 1211(b)↩ limited the capital loss petitioners could claim to $3,000.
5. The tax treatment of the 90,000 shares of Lil David stock issued to petitioner on July 16, 1974, is not in dispute.↩
6. A sec. 1244 plan must be in writing and have a prescribed content. See sec. 1.1244(c)-1(c)(1), Income Tax Regs. (Current sec. 1.1244(c)-1(f)(1)(ii), Income Tax Regs., is substantially similar.) The plan may be stated in one or more documents. Mogab v. Commissioner,70 T.C. 208, 213 (1978); Hayden v. Commissioner,52 T.C. 1112, 1124↩ (1969).
7. Current sec. 1.1244(c)-1(f)(3)(ii), Income Tax Regs.↩, is substantially similar.
8. In certain circumstances, secs. 1311-1314 lift the bar of the statute of limitations to open an otherwise closed taxable year. Petitioners argue that if the Lil David stock became worthless in 1977, a closed year, "any amounts not allowed in 1978 should be allowed in prior year(s) in accordance with I.R.C. sec. 1311." For the mitigation provisions to apply, there must be a prior "determination," as defined in sec. 1313, that establishes the correct treatment for a disputed item. See sec. 1311(a)↩. A "determination" under sec. 1313(a) means: (1) A final decision by the Tax Court or other court of competent jurisdiction; (2) a closing agreement made under sec. 7121; (3) a final disposition of a claim for refund; or (4) an agreement pursuant to the regulations issued under sec. 1313. There is no evidence in this case of a prior determination and, therefore, the mitigation provisions cannot apply at this time. 9. Respondent nevertheless concedes that petitioners are entitled to a $3,000 capital loss deduction for 1978, the maximum amount allowable for that year. Respondent acknowledges that petitioners have a capital loss carry-over from 1976 based on petitioner's stock interest in another corporation, Pan Pacific Golf, Inc. ↩
10. Respondent contends that if petitioners have an ordinary loss under sec. 1244 that is claimable in 1977, the loss would be fully used in closed taxable years and would not carry over to 1978. Because of our holding that petitioners do not have a loss under sec. 1244↩, we need not consider this contention.