WILLIAM T. SCHNURR and JUDITH G. SCHNURR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schnurr v. Commissioner
Docket No. 15472-85.
United States Tax Court
T.C. Memo 1989-275; 1989 Tax Ct. Memo LEXIS 275; 57 T.C.M. (CCH) 657; T.C.M. (RIA) 89275; June 7, 1989. Sidney W. Azriliant and Bernard Kobroff, for the petitioners. Moira L. Sullivan, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined a deficiency in petitioners' 1981 income tax in the amount of $ 10,499.52. The deficiency arises as a result of an unprofitable investment made by William T. Schnurr (petitioner) in an attempt to acquire interests in both the Canaan Oil Company, Inc. and Canaan Oil and Fuel Company (together referred to as Canaan or the Company) for which a business bad debt deduction was claimed. The issue for decision is whether petitioner's investment is deductible (a) *277 either as an ordinary loss under section 165(a)[1] or as a bad debt under section 166, as petitioner contends, or (b) as a capital loss under section 165(g), as respondent contends. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. At the time of filing their petition, petitioners resided in Garden City, New York. At all relevant times petitioner was employed as a stockbroker on Wall Street. His friend, James Metz (Metz), owned a fuel oil company located on Long Island, New York, and contemplated the acquisition of a controlling ownership interest in the Company which was in the fuel oil business in Canaan, Connecticut. Metz, knowing of petitioner's desire to leave Wall Street, approached petitioner in the spring of 1974 with a proposal to join with him in the acquisition of Canaan. Petitioner told Metz that he would be willing to move his family to Connecticut to become the Company's general manager. Metz thereafter began negotiations to acquire *278 control of Canaan from Geoffrey Smith (Smith), the sole stockholder of Canaan. Following these preliminary negotiations, Metz and Smith signed a letter of intent on August 23, 1974, with respect to Metz's acquiring two-thirds of the stock of Canaan from Smith. The letter provided, in pertinent part: I am writing to confirm our understanding with regard to my future participation as a principal in the affairs of The Canaan Oil Company and the Canaan Oil & Fuel Company. You presently own or control all of the oustanding capital stock of these two companies. As of now these shares are worthless, but we both feel that the potential for a successful business is there. What is obviously needed is more capital and better management. Basically, our deal is that you will turn over to me, or to my nominee, two-thirds of the capital stock in return for my assuming the management function and investing whatever sums are necessary, in my opinion, to keep the business going. You will continue to do what you do best, which is sell the product. Perhaps I should add that you are assuming no personal responsibility for the money I will be putting in the business. * * * Obviously it is *279 going to take a little while for [the attorneys] * * * to complete the legal work. In the meantime, I would like to proceed with a least some capital investment. As we both know, it is important at this point that we not lose too much time. Both Metz and petitioner believed that the letter offered them "visible protection" in the Company. Petitioner sold his house in New York, and in the early summer of 1974, he moved his family to Connecticut. Despite petitioner's plan to become the Company's general manager, at some point during the negotiations between Metz and Smith, it was decided that Smith would remain the Company's manager. Accordingly, petitioner remained in his Wall Street position. Prior to Metz's and petitioner's participation, the Company was virtually bankrupt, and it had no cash to buy fuel oil for sale to customers (product). At the time the letter of intent was signed, Hartford National Bank held all of the Company's stock as collateral for its $ 10,000 loan to the Company. Hence, neither Metz nor petitioner received possession of the stock. Other than the letter of intent, petitioner, Metz and Smith did not execute any agreement formalizing the sale *280 of the stock of the Company. Subsequent to signing the letter of intent, in August, 1974, Metz transferred $ 10,000 to the Company. Petitioner reimbursed Metz $ 5,000 as his share of the $ 10,000 payment to the Company. Petitioner contends that the payment to the Company was a loan, whereas respondent contends such payment was a capital contribution. No terms of repayment were agreed upon, and petitioner received no documentation for the alleged loan. Shortly after the letter of intent was signed, Metz was elected president of the Company and took over the management of the Company. He did not receive a salary. Petitioner's wife became the secretary and treasurer of the Company. She began to work for the Company, without pay, on a daily basis, answering its phone and keeping its books. Petitioner met with both Metz and Smith on a weekly basis regarding the operation of the Company. However, petitioner was not actively involved in the day-to-day operations of the Company nor was he an employee, director, or officer of the Company. In fact, other than paying for his share of the $ 10,000 payment made by Metz to the Company, and repaying what he considered to be his share *281 of three debts incurred on behalf of the Company, as discussed below, petitioner concedes he did very little with respect to the Company. On January 21, 1975, petitioner signed, as a co-maker with the Company, a 30-day note for $ 10,000 payable to the Central State Bank. On February 20, 1975, he signed another $ 10,000 note, as a co-maker with the Company, payable to Central State Bank on May 30, 1975. Central State Bank would not have made these loans to the Company without petitioner's participation as a co-maker. The proceeds of the Central State Bank loans were used to purchase product for the Company. Petitioner expected these loans would be repaid from the Company's sale of the product so purchased. The third debt transaction originated on March 6, 1975, when Metz signed an agreement with Metropolitan Petroleum Company (Metropolitan Petroleum) guaranteeing Canaan's payments to it for product delivery. The guarantee was not signed by petitioner. Relations between Metz and petitioner, on the one hand, and Smith, on the other, gradually deteriorated. By April, 1975, it became clear that the Company would not be able to survive; Smith, Metz and petitioner agreed that *282 the company should be sold to others. Unbeknownst to Metz and petitioner, on August 14, 1975, Smith sold the assets of the Company to Ralph Devino (Devino), the owner of Whip-it Auto Shoppes, Inc. (Whip-it). At the time of sale, the Company had accounts receivable of between $ 35,000 and $ 45,000, as well as trucks, tanks and buildings. Neither petitioner nor Metz were ever reimbursed for any sums they paid to or on behalf of the Company, nor did they ever physically receive stock in the Company. Petitioner and Metz nonetheless paid the three debts which they incurred with regard to their involvement in the Company. With respect to the Central State Bank loans, on May 5, 1976, petitioner paid Central State Bank $ 9,750; his check to the bank bore the notation "1/2 Canaan Oil Co." Petitioner contends that he paid the $ 9,750 because the bank pursued him for repayment after the Company failed to satisfy its obligation. Petitioner contends that the notations on the check meant that he was paying his one-half share of the money that he borrowed with Canaan. [2]
Between January 2, 1977, and October 3, 1977, petitioner issued 10 checks, *283 each in the amount of $ 750, to Metropolitan Petroleum. Several of the checks bore the notation "Canaan Oil." Although petitioner did not sign the guaranty, petitioner contends that his $ 7,500 payment represented his one-half share of Metz's guaranty to Metropolitan Petroleum. On October 21, 1976, Metz instituted an action in the Superior Court Judicial District of Litchfield, Connecticut (the State Court) against Smith, Whip-it, et al. for breach of contract, fraudulent conveyance and fraud. Neither Smith nor a representative of the Company appeared. In effect, two empty chairs were sued, and the empty chairs won. The State Court found that Smith's stock was not turned over to petitioner and Metz because it was held by the Hartford National Bank as collateral for a loan. The court further found that Metz and petitioner bargained solely for rights as majority shareholders, that no debtor-creditor relationship had been created between the Company and them and that no fraud had been perpetrated upon them by Smith. On January 24, 1980 Metz filed a substitute complaint with the State Court against Canaan. Again, the State Court entered judgment in favor of the defendants. *284 On their joint 1981 Federal income tax return, petitioners claimed a bad debt loss in the amount of $ 21,000 [3] as a result of the aforementioned transactions involving Canaan. Respondent disallowed the claimed deduction, contending petitioners failed to establish that the debt arose from a "true debtor-creditor relationship based upon a valid and legally enforceable obligation." In his Answer to the Petition, respondent asserts that as a result of the State Court decisions petitioners are collaterally estopped from claiming a bad debt loss. Schedule D of petitioners' tax return reflected a net unused capital loss carryover of $ 5,851. OPINION Petitioners and respondent agree that petitioner's advances to and for *285 Canaan should be treated as capital contributions. Petitioners nevertheless principally contend that since they did not receive stock nor an enforceable right to subscribe to stock, their loss is deductible under section 165(a) because no sale or exchange of stock occurred, which petitioners contend is a precondition for capital loss treatment. Thus, they contend, such loss is deductible under section 165(a) either as a loss incurred in a transaction entered into for profit (section 165(c)(2)) or as a casualty loss (section 165(c)(3)). Petitioners alternatively contend that their advances are deductible as a business bad debt under section 166(a)(1). We disagree with all of these contentions. The fallacy in petitioners' position lies in the fact that, for tax purposes, possession of stock certificates is not required to evidence ownership of an interest in a corporation nor does the retention by the seller of formal attributes of ownership preclude finding a sale. Cf. Pacific Coast Music Jobbers v. Commissioner,55 T.C. 866, 874 (1971), affd. 457 F.2d 1165 (5th Cir. 1972). *286 For tax purposes, the transfer of sufficient incidents of beneficial ownership constitutes a sale of stock; satisfaction of the technical requirements for passage of title under state law is not mandatory. See Maher v. Commissioner,55 T.C. 441, 451-452 (1970), affd. in part and revd. in part 469 F.2d 225 (8th Cir. 1972); Clodfelter v. Commissioner,48 T.C. 694 (1967), affd. 426 F.2d 1391 (9th Cir. 1970). Beneficial ownership is marked by command over property or enjoyment of its economic benefits. Anderson v. Commissioner,164 F.2d 870, 873 (7th Cir. 1947), affg. 5 T.C. 443 (1945). In ascertaining the beneficial owner of stock, the substance of the transaction, and not its form, controls. Yalencsics v. Commissioner,74 T.C. 1513, 1524 (1980). Thus, for tax purposes, "securities" include not only shares of stock in a corporation, but also the right to receive shares of stock resulting from advances to the corporation. Section 165(g)(2)(B); Kalech v. Commissioner,23 T.C. 672, 681 (1955); *287 Janeway v. Commissioner,2 T.C. 197 (1943), affd. 147 F.2d 602 (2d Cir. 1945). The letter of intent required Smith to transfer two-thirds of the Company's stock to Metz in exchange for Metz's assumption of the management of the Company and investment of funds in the Company. Smith was unable to physically transfer the Company's stock to Metz and petitioner because the stock was being held by the Hartford Bank as collateral for a loan. We believe petitioner and Metz had a conditional right to receive shares of the Company's stock. The possession of such a right constitutes a "security" for purposes of section 165(g)(2). In Gawler v. Commissioner,60 T.C. 647 (1973), affd. per curiam 504 F.2d 425 (4th Cir. 1974), the taxpayers' rights to receive stock was conditioned on the successful performance of the business. We there held that such a condition was not fatal to the characterization of the right to receive stock as a "security" within the meaning of section 165(g)(2). In the instant case, petitioner's right to receive *288 the Company's stock was conditioned upon the relinquishment of the stock as collateral by the Hartford National Bank and upon Metz's and petitioner's financial and management assistance to the Company. In our opinion, petitioner's conditional right to receive the Company's stock was less substantial and restrictive than that of the taxpayers in Gawler. We, therefore, conclude that petitioner had a "security," the basis of which was his total proven capital contribution in the amount of $ 22,250. Having decided that petitioners received a security, we must next decide whether petitioners are entitled to claim a deduction in 1981 for the worthlessness of their security pursuant to section 165(g). The year in which stock becomes worthless is a question of fact, and the burden of proof is upon the taxpayer. Young v. Commissioner,123 F.2d 597 (2d Cir. 1941); section 1.165-1(d)(2)(i), Income Tax Regs.
The standards for determining the year in which securities can be deducted as worthless were summarized by the Board of Tax Appeals as follows: *289 From an examination of [the] cases it is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. * * * Morton v. Commissioner,38 B.T.A. 1270, 1278 (1938), affd. 112 F.2d 320 (7th Cir. 1940). Whether the potential value of an enterprise has been depleted by an identifiable event is a question of fact to be decided after an evaluation of all of the relevant facts. Boehm v. Commissioner,326 U.S. 287, 292-293 (1945). The sale of the assets of the corporation and the cessation of business are two of such identifiable events. See, e.g., Austin Co. v. Commissioner,71 T.C. 955 (1979). *290 However, even the cessation of operations and sale of all assets may not constitute a "closed transaction" if there is a possiblity of recovery through litigation. Ramsay Scarlett & Co. v. Commissioner,521 F.2d 786 (4th Cir. 1975); secs. 1.165-1(d)(2)(i) and (ii), Income Tax Regs.; Bail Fund of Civil Rights Congress v. Commissioner,26 T.C. 482 (1956). On August 14, 1975, when the Company was sold to Devino, the value of petitioner's right to acquire the Company's stock descended from being virtually worthless to wholly worthless. However, at that time, petitioner had a reasonable prospect of recovery of the investment he had in the Company. It was not until he and Metz adjudicated their claims against Smith and the transferee of the Company's assets and the State Court decided against them that petitioner's right to reimbursement was extinguished. Accordingly, we hold that petitioner's loss is properly deductible in 1981 as a capital loss pursuant to the provisions of section 165(g). Because we have concluded that petitioners' loss is deductible pursuant to section 165(g) as a capital loss arising from the worthlessness of a security, there *291 is no need to address petitioners' other arguments. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during 1981.↩
2. Canaan had previously made one payment.↩
3. The amount actually expeded by petitioner totaled $ 22,250. $ 5,000
paid to Metz, as petitioner's share of
the $ 10,000 transferred by Metz to
Canaan.
9,750 paid to Central State Bank in repayment
of notes
7,500
paid to Metroplitan Petroleum pursuant
to Metz's guarantee
$ 22,250
No explanation was given as to why petitioners claimed only $ 21,000 of the $ 22,250 as a bad debt loss on their 1981 return.↩